UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2002

(Argued:   February 28, 2003

Decided:       September  5, 2003
Errata Filed:  September  9, 2003)

Docket No. 02-1354

_____

UNITED STATES OF AMERICA,

*Appellee*,

—v.—

SOFWAT KHEDR,

*Defendant*,

ABDULLAH ALHUMOZ,

*Defendant-Appellant*.

_____

B e f o r e :

STRAUB, KATZMANN, and RAGGI, *Circuit Judges*.

_____

Appeal from the judgment of the United States District Court for the Eastern District of New York (Nina Gershon, *Judge*) convicting Defendant-Appellant Abdullah Alhumoz, after a jury trial, of conspiring to commit bank and credit card fraud in violation of 18 U.S.C. § 371. Because we conclude that there was insufficient evidence to support the District Court's application of an obstruction-of-justice enhancement to Alhumoz's sentence, we remand for resentencing.

Judge Raggi concurs in part and dissents in part in a separate opinion.

_____

ROLAND R. ACEVEDO, Seiff, Kretz & Maffeo (Thomas Eddy, on the brief), New York, NY, *for Defendant-Appellant*.

JO ANN M. NAVICKAS, Assistant United States Attorney for the Eastern District of New York (David C. James, Assistant United States Attorney, of counsel; Roslynn R. Mauskopf, United States Attorney, on the brief), Brooklyn, NY, *for Appellee*.

————————————

STRAUB, *Circuit Judge*:

Defendant-Appellant Abdullah Alhumoz appeals from a judgment of the United States District Court for the Eastern District of New York (Nina Gershon, *Judge*) convicting him, following a jury trial, of conspiring to commit bank and credit card fraud in violation of 18 U.S.C. § 371. Alhumoz is a used-car dealer in Brooklyn who was involved in a scheme to make money by securing auto loans for customers and cars that did not exist. He argues on appeal that his conviction should be reversed because he received ineffective assistance from his trial counsel. Alhumoz also asserts that the District Court improperly enhanced his sentence for (i) obstructing justice and (ii) receiving more than $1 million in "gross receipts" from his crime. We decline to address the ineffective-assistance claim, and affirm the District Court's application of the gross-receipts sentencing enhancement, but hold that there was insufficient evidence to support the application of the obstruction-of-justice enhancement to Alhumoz's sentence. We therefore remand for resentencing on this limited ground.

**BACKGROUND**

In January 2002, Alhumoz was tried in the Eastern District of New York for conspiracy to commit bank fraud and credit card fraud, together with co-defendant Safwat Khedr, a merchant who participated in a related scheme. The charges against Alhumoz arose out of his participation in a scheme led by an acquaintance, Mustafa Yassin, who later cooperated with the government and testified against Alhumoz at trial. Yassin recruited and paid "customers" to give him their Social Security numbers, birthdates, and other personal information. Yassin used the information for his credit card schemes and also gave the information to Alhumoz, who used it to apply for fraudulent car loans on the Internet. Whenever a loan was granted, Yassin brought the check to Alhumoz, who cashed the check, paid part of the proceeds to Yassin, and kept the remainder for himself. The car loans were never repaid.

Yassin's trial testimony about the scheme was corroborated by another cooperating witness, Salaheldin Fawzy, who testified that he was recruited to be a "customer" by Yassin, that Alhumoz applied for a car loan in Fawzy's name, and that he had carried money from Alhumoz to Yassin on several occasions. Both witnesses' testimony was corroborated by excerpts of a conversation that Fawzy recorded with Alhumoz in which Alhumoz discussed his unsuccessful attempt to obtain a car loan in Fawzy's name.

In addition, the government introduced bank files relating to 21 car loan applications that had been submitted over the Internet. All but one of the applications were submitted in cooperating witness Yassin's name, the name of one of his aliases, or a name that Yassin identified at trial as one of his customers. Evidence adduced at trial demonstrated that the vehicle identification numbers listed in the loan application materials were either invalid or used for more than one loan, and the car dealerships listed on the applications did not exist at the

addresses listed.

The government connected Alhumoz to these 21 fraudulent loan applications through several pieces of physical evidence. A computer seized from Alhumoz's apartment held files relating to the e-mail addresses used to submit the applications, along with information for "Qamar Echevarria," an alias that Alhumoz admitted he used. Of the nine loan checks introduced at trial, three carried Alhumoz's fingerprints, and one of the loan checks had Alhumoz's telephone number written on the face of the check. Further, invoices for two of the dealerships listed on the fraudulent loan applications were found in Alhumoz's possession, while blank invoices and corporate records for these dealerships, along with uncashed car loan checks, were found at apartments used by Alhumoz.

After a seven-day trial, Alhumoz was convicted of conspiring to commit bank fraud and credit card fraud in violation of 18 U.S.C. § 371. He was sentenced to five years' imprisonment and three years' supervised release, and ordered to pay restitution in the amount of $453,400. He is currently serving his sentence.

Alhumoz appeals his conviction, arguing that it is constitutionally infirm because he was provided ineffective assistance of counsel. He also challenges the application of two enhancements to his sentence, arguing that the District Court erred in increasing his sentencing range based on "gross receipts" totaling more than $1 million from his crime, and obstruction of justice.

**DISCUSSION**

**I.      Ineffective Assistance**

Defendant's primary challenge to his conviction is that he received ineffective assistance of counsel at trial in violation of the Sixth Amendment, and should therefore receive a new trial. Although defendant has had new counsel representing him at sentencing and on appeal, this court has expressed a "baseline aversion to resolving ineffectiveness claims on direct review." *United States v. Williams*, 205 F.3d 23, 35 (2d Cir.) (quoting *United States v. Salameh*, 152 F.3d 88, 160-61 (2d Cir. 1998)), *cert. denied*, 531 U.S. 885 (2000). Among the reasons for this preference is that the allegedly ineffective attorney should generally be given the opportunity to explain the conduct at issue. *See Sparman v. Edwards*, 154 F.3d 51, 52 (2d Cir. 1998) (per curiam). This court has, however, entertained ineffective assistance claims for the first time on direct appeal when their "resolution is 'beyond any doubt' or to do so would be in the interest of justice." *United States v. Matos*, 905 F.2d 30, 32 (2d Cir. 1990) (quoting *United States v. Aulet*, 618 F.2d 182, 186 (2d Cir. 1980)).

The Supreme Court recently had occasion to remind us that "in most cases a motion brought under § 2255 is preferable to direct appeal for deciding claims of ineffective-assistance." *Massaro v. United States*, 123 S.Ct. 1690, 1694 (2003). In *Massaro*, the Supreme Court indicated that ineffective-assistance claims should ordinarily "be litigated in the first instance in the district court, the forum best suited to developing the facts necessary to determining the adequacy of representation during an entire trial." *Id*. Accordingly, the Supreme Court explained, few ineffective-assistance claims "will be capable of resolution on direct appeal." *Id*. at 1695. Consistent with this approach, we decline to address the ineffective assistance claim on this direct appeal.

## II.     Gross Receipts Enhancement

Alhumoz also challenges two issues related to his sentence. The first challenge is to the District Court's application of four additional levels to his base sentencing level, pursuant to U.S.S.G. § 2F1.1(b)(7)(B),[1] because Alhumoz derived more than $1 million in "gross receipts" from the crime.

### A.     Standard of Review

The government argues that Alhumoz waived his objection to the inclusion of these loans by failing to object at sentencing, and specifically agreeing to the government's representation that approximately $1.7 million was the "actual loss amount" attributable to defendant's crime. Although defendant did not contest the "actual loss" calculation for purpose of U.S.S.G. § 2F1.1 (b)(1)(N), he did object to the government's contention that he should receive a sentencing enhancement pursuant to U.S.S.G. § 2F1.1 (b)(7)(B) for having derived more than $1,000,000 in "gross receipts" from his crime. Therefore, this challenge was not waived.

Nonetheless, it is undisputed that defendant did not specifically object to the particular loans – $186,000 borrowed from the companies Peoplefirst.com and Giggo.com – that he now challenges on appeal, and therefore his challenge is subject to "plain error" review. *See* Fed. R. Crim. P. 52(b). Defendant argues that this challenge should be reviewed under a less rigorous standard based on *United States v. Sofsky*, 287 F.3d 122, 125-26 (2d Cir. 2002), because he did not receive prior notice of the fact that the companies did not claim that they actually lost money on the loans. Although defendant did have prior notice that these loans were being attributed to

---

[1] The 1998 Guidelines Manual was used to calculate Alhumoz's sentence. In the 2002 version of the Guidelines, this enhancement is found at U.S.S.G. § 2B1.1(b)(12)(A), and results in an increase of only two levels.

6

him as part of the "gross receipts" calculation, he claims in his brief on appeal that he did not know that these companies were not claiming losses on these loans until he was handed the Third Addendum to the PSR, only minutes before the sentencing proceeding in District Court was to begin. We need not decide, however, whether this circumstance warrants application of a more relaxed plain error standard, *see id*. at 125, because we conclude that the District Court's application of this enhancement was proper under any standard.

B.      Application of Enhancement

Under § 2F1.1(b)(7)(B), the District Court is to provide a four-level enhancement to a defendant's offense level if the offense "affected a financial institution and the defendant derived more than $1,000,000 in gross receipts from the offense." At sentencing, the government argued that defendant was responsible for borrowing $1,718,000 in phony auto loans, and that defendant received 60 percent of the face value of these loans, or $1,031,085. The 60 percent figure was arrived at after deducting the 10 percent the defendant gave various vendors to cash the checks, and the 30 percent that defendant gave to co-conspirator Mustafa Yassin. Defendant argues that without the $186,000 in loans from Peoplefirst.com and Giggo.com, the $1,031,085 in "gross receipts" would fall below the $1 million threshold. We reject the claim for two reasons.

First, we believe that the $186,000 was properly included. The term "gross receipts" is defined in the Guidelines with reference to 18 U.S.C. § 982(a)(4), which indicates that "'[g]ross receipts from the offense' includes all property, real or personal, tangible or intangible, which is obtained directly or indirectly as a result of such offense." Application Note 18 to § 2F1.1 (citing 18 U.S.C. § 982 (a)(4)). That the companies did not claim a loss does not mean that the loans are not "property . . . obtained" by Alhumoz as a result of the offense. Put simply, Alhumoz received a check from these companies because he submitted fraudulent loan applications; he

7

does not claim that he never received these checks, or that he paid the money back. As the District Court put it, "it is not at all clear to me why the face value of the checks, which were sent to this defendant, doesn't in itself completely establish that the gross receipts to this defendant were the 1.7 million dollars."[2]

Second, even if defendant is correct that the $186,000 should not have been included, we agree with the government that, if anything, the District Court's ultimate calculation may actually understate Alhumoz's "gross receipts" because it is not clear that the 10 percent fee to the check-cashers should have been deducted. As the District Court put it:

> I hardly think . . . that the amount a defendant pays to negotiate a check ought to be deducted anymore than if he put these in his own bank account and the bank charged him $50 a month for his checking services or 50 cents a check for deposit ought to be deducted from his gross receipts.

*See, e.g.*, *United States v. Bennett*, 161 F.3d 171, 193 (3d Cir. 1998) (rejecting defendant's argument that he did not receive all the funds "individually" because he subsequently transferred much of the money to consultants and others), *cert. denied*, 528 U.S. 819 (1999). In short, "gross receipts" is not the equivalent of "net profits," and, if properly calculated as 70 percent of either $1.7 million or, excluding the Peoplefirst.com and Giggo.com loans, $1.5 million, Alhumoz's share would be safely over the $1 million threshold. We agree with and adopt the District Court's reasoning, and therefore affirm the application of the enhancement for gross receipts totaling more than $1 million.

---

[2] *But see* Application Note 18 to § 2F1.1 ("'The defendant derived more than $1,000,000 in gross receipts from the offense,' as used in subsection (b)(7)(b), generally means that the gross receipts to the defendant individually, rather than to all participants, exceeded $1 million."); *United States v. Millar*, 79 F.3d 338, 346 (2d Cir. 1996) (remanding to the District Court for findings on the amount of gross receipts defendant derived "individually – not jointly – from the offense").

**III.    Obstruction-of-Justice Enhancement**

      A.  <u>The Relevant Standards</u>

We subject an obstruction-of-justice enhancement to a mixed standard of review.  *See United States v. Cassiliano*, 137 F.3d 742, 745 (2d Cir. 1998).  "The sentencing court's findings as to what acts were performed, what was said, what the speaker meant by her words, and how a listener would reasonably interpret those words will be upheld unless they are clearly erroneous.  A ruling that the established facts constitute obstruction or attempted obstruction under the Guidelines, however, is a matter of legal interpretation and is to be reviewed *de novo*, giving 'due deference to the district court's application of the guidelines to the facts.'"  *Id*. (quoting 18 U.S.C. § 3742(e) (1994)) (internal citations omitted).

The § 3C1.1 enhancement for obstruction is to be imposed only if the obstruction, or attempted obstruction, was "willful[]."  Because that term "implies a *mens rea* requirement," *United States v. Reed*, 49 F.3d 895, 900 (2d Cir. 1995), we have generally limited the application of the Guideline to those cases in which "the defendant had the specific intent to obstruct justice."  *United States v. Hernandez*, 83 F.3d 582, 585 (2d Cir. 1996); *see also United States v. Stroud*, 893 F.2d 504, 507-08 (2d Cir. 1990).  In some cases, however, conduct may be "so inherently obstructive of the administration of justice" that the enhancement should be applied if the defendant deliberately engaged in that conduct, regardless of her specific purpose.  *See United States v. Reed*, 88 F.3d 174, 178 (2d Cir. 1996) (intentional failure to appear for sentencing).

The facts necessary to support an obstruction-of-justice enhancement need be proven only by a preponderance of the evidence.  *See Hernandez*, 83 F.3d at 585.  In determining the intent with which a defendant acted, a district court is entitled to rely on circumstantial evidence and on

all reasonable inferences that may be drawn from all of the evidence. *See United States v. Sisti*, 91 F.3d 305, 313 (2d Cir. 1996).

   B.   Application of Standard to the Facts of this Case

The factual basis for the obstruction-of-justice enhancement was as follows:  According to the trial testimony of the investigating FBI agents, Alhumoz was arrested in an office in Brooklyn while working on a laptop computer, with numerous documents in the office.  The morning after his arrest, while he was in custody awaiting arraignment, the agents returned to the office.  They entered with the key that Alhumoz had given them upon arrest, and noticed that many of the documents were missing.  A few of the agents stayed at the office to conduct surveillance, and later saw a person approaching in a green Cadillac.  The person got out of the car, looked around, and started to enter the office with a key.  The agents approached him, and they detained and questioned him.  He identified himself as Feras Abu Foudeh, acknowledged that the office belonged to his uncle,[3] and told the agents that an individual named Mohammed had sent him to clean out the office so that it could be rented.  Foudeh gave conflicting answers to the agents about whether he had been at the office the previous evening, and whether he had removed anything from the office the previous evening.  While Foudeh was speaking to the agents, Mohammed paged him several times.

With Foudeh's consent, the agents then searched his car, and found a purse with Alhumoz's passport and $47,500 in cash, as well as various papers.  The agents then went to Foudeh's apartment, also with his consent, and found a laptop computer that Foudeh

---

[3]  There appears to be some confusion about whether Alhumoz is Foudeh's uncle or cousin.  For the purpose of this opinion and consistent with the parties' submissions on appeal, we will refer to Foudeh as Alhumoz's cousin.

acknowledged had been in Alhumoz's office the day before.

Alhumoz's Presentence Report erroneously stated that Foudeh "informed the FBI agents that the <u>defendant</u> instructed him to clean out the office space." (emphasis added). It was on that basis that the Probation Department initially recommended that Alhumoz receive a sentencing enhancement for obstructing justice. At the sentencing hearing, after that mistake was corrected, the government argued that Alhumoz should nonetheless receive the obstruction-of-justice enhancement based on two other theories: (i) that the defendant should be held accountable for the obstruction of co-conspirator Mohammed pursuant to U.S.S.G. § 1B1.3, and alternatively, (ii) that the defendant himself obstructed justice. The District Court rejected the first theory, and accepted the latter, in a ruling which concluded:

> I do, however, find sufficient evidence to conclude that the defendant himself did specifically intend to obstruct justice. The defendant had been observed working at a computer in the office in question from which the evidence, evidence relevant to this case, was removed. That office had been secured by the agents with the defendant's knowledge and the key to that, the door of the office had been given to the agents and Agent Rothe's testimony at the trial established that. Later this person we're calling a cousin of the defendant (Foudeh) arrived at the office in the defendant's personal vehicle which contained the defendant's passport, a large sum of cash among other things and he was seen attempting to enter the rear door of that office. He (Foudeh) later admitted that he had removed a laptop from the office claiming that it was his laptop that he had lent to the defendant. He described the office as his uncle's office or, for our purposes, his cousin's office and he said he went there to clean it out because he was thinking of renting it from his uncle or cousin.
>
> This action on the part of this person clearly suggests that it was the defendant who had an interest in having this office cleaned out of the evidence that might prove his guilt at trial and was responsible for it. The defendant here relies on the fact that this cousin of the defendant said it was Mohammed who had sent him to the office but the circumstantial evidence is ample to support the inference that if it was Mohammed who sent him, Mohammed did so not just on the defendant's behalf, as the uncle made threats to witnesses in the *Hernandez* case, but specifically at the defendant's direction. It is highly improbable that the cousin would have entered what he knew was the defendant's office and removed the computer he had lent to the defendant, used the defendant's own personal car, which had in it the defendant's passport and a large sum of money, at the direction of Mohammed if this cousin were not confident that any direction from

11

Mohammed was made at the defendant's request. It was also, of course, the defendant who was facing criminal charges at this time.

The District Court's findings constitute, for our purposes, the "established facts" — that Alhumoz was working on a laptop when arrested, that the FBI agents saw Alhumoz's cousin approach the office the next day in Alhumoz's car, which contained Alhumoz's passport and nearly $50,000, and that the laptop was gone from the office and later found in Foudeh's apartment. The question is whether those "established facts" constitute "obstruction . . . under the Guidelines" by this defendant, or more specifically, whether those "established facts" are sufficient to prove by a preponderance of the evidence the "willful" *mens rea* requirement of U.S.S.G. § 3C1.1 as to Alhumoz. *Cassiliano*, 137 F.3d at 745. For the reasons that follow, we conclude that there was insufficient evidence that Alhumoz had the "specific intent" to obstruct justice to warrant the application of this enhancement.

First, as suspicious as it may appear at first glance, the significance of the fact that Alhumoz's cousin, Foudeh, was driving Alhumoz's car, with his passport and money in it, should not be overstated. Alhumoz's wife testified at trial that she had given Foudeh her purse containing the bail money, taken from a safe-deposit box, and Alhumoz's passport after she went to go see Alhumoz's lawyer. This evidence was never contradicted or discredited in any way by the government or the District Court, and the FBI agent who searched the car confirmed at trial that the money was found in a purse containing the driver's license of Alhumoz's wife.

Second, although the District Court concluded that Foudeh was acting at Alhumoz's direction, there were any number of equally plausible explanations for why Foudeh removed the laptop from the office: (1) he was telling the truth, and the computer did belong to him; (2) Foudeh may have been acting in what he believed was his cousin's best interest (but not at

12

Alhumoz's direction); (3) Foudeh himself may have played a peripheral role in the conspiracy, although he was not charged, and had his own reasons for removing evidence; or (4) Mohammed directed the removal for his own reasons — as defense counsel suggested at trial, he may well have been one or more of the phony customers in the auto loan scheme, and he did page Foudeh several times while Foudeh was speaking with the agents.

Under any of these scenarios, Alhumoz did not have the specific intent to obstruct justice. We underscore that the existence of alternative explanations would not matter were there evidence of words or conduct by the defendant from which to draw an inference that he specifically intended to obstruct justice. Indeed, it is well-established that "the task of choosing among competing, permissible inferences is for the fact-finder, not for the reviewing court." *United States v. McDermott*, 245 F.3d 133, 137 (2d Cir. 2001).

If there was circumstantial evidence such as a phone call from Alhumoz to Mohammed or Foudeh shortly before Foudeh's visit to the office, for example, we would be inclined to affirm the enhancement, even if there was no evidence as to what was said. But the evidence linking the defendant to the obstruction is significantly less than in prior cases where we have affirmed the application of the enhancement.[4] Indeed, in some of our cases *reversing* the application of

[4] *See United States v. Feliz*, 286 F.3d 118, 119-21 (per curiam) (2d Cir. 2002) (defendant's friends told police that defendant asked them to corroborate his false alibi in the event that he was arrested; sufficient to support willful obstruction of justice); *United States v. White*, 240 F.3d 127, 138 (2d Cir. 2001) (affirming enhancement based on narcotics defendant's conduct at time of his arrest, when he told his girlfriend that she should tell police drugs were hers); *United States v. Carty*, 264 F.3d 191, 194-95 (per curiam) (2d Cir. 2001) (finding that defendant fled to and remained in the Dominican Republic in order to avoid sentencing was sufficient to support the enhancement); *United States v. Lincecum*, 220 F.3d 77, 79-81 (2d Cir. 2000) (per curiam) (affirming enhancement based on false affidavit defendant submitted to the court); *United States v. McKay*, 183 F.3d 89, 92-95 (2d Cir. 1999) (affirming application of the enhancement in part based on defendant's lying to probation officer about his role in the drug distribution activities in order to affect his sentence); *Cassiliano*, 137 F.3d at 747 (affirming

13

the obstruction-of-justice enhancement, the government had more evidence of "specific intent" to obstruct justice by the defendant than has been introduced in this case.[5] In this sense, we view this case as similar to *Hernandez*, where we specifically relied on the fact that there was nothing to indicate that the "defendant even knew of, let alone was in any way responsible for," his uncle's alleged obstruction. 83 F.3d at 586. Accordingly, the enhancement should not have been applied.

**CONCLUSION**

For the reasons stated, we decline to address the ineffective-assistance claim, and affirm the application of the gross receipts enhancement to his sentence, but remand for resentencing on the ground that the obstruction-of-justice enhancement should not have been applied. The motion for bail pending appeal is denied as moot.

---

obstruction-of-justice enhancement where defendant "made assiduous efforts to reach [potential witness], with the admitted purpose of . . . alerting him [to the investigation] and asking him whether she should lie to the FBI" and in part to "prevent the collection of any further evidence").

[5] *See, e.g.*, *Hernandez*, 83 F.3d at 584-87 (reversing District Court's finding of obstruction-of-justice, although government had presented evidence of six separate incidents of attempted witness intimidation); *United States v. Williams*, 79 F.3d 334, 336-37 (2d Cir.1996) (false story given to officer following arrest in an effort to disassociate himself from co-conspirator was insufficient to support the enhancement); *United States v. Perdomo*, 927 F.2d 111, 117-18 (2d Cir. 1991) (reversing and remanding for further fact-finding on application of the obstruction-of-justice enhancement in part because it was "as possible" that defendant directed co-conspirator "to place the cocaine under a car because that was its drop-off point as it is that he was attempting to thereby conceal the cocaine from law enforcement officers," even though defendant knew law enforcement officers were following them).

14